September 11, 2015

Valentin Moreno, Jr.
788216, Robertson Unit
12071 FM 3522
Abilene, Texas 79601

Abel Acosta, Clerk
Court of Criminal Appeals
P.O. Box 12308
Capitol Station
Austion, Texas

RECEIVED IN
COURT OF CRIMINAL APPEALS

SEP 18 2015

Re: Your Letter Dated (09-01-15) & Refiling
    Last known Writ No. WR-49,474-04

Greetings Mr. Acosta:

On June 15, 2015, I filed an application for writ of habeas corpus, in the 332nd District Court of Hidalgo County, Texas. The cause number therein, was CR-0517-96-F(3). On July 20, 2015, Judge Mario E. Ramirez, Jr., entered his Findings of Facts, Conclusions of Law, Recommendation and Order. I then filed in this Court; Applicant's Objections and Applicant's Request for Judicial Notice. However, these pleadings were all sent back by you, with a letter advising me, that my application had not been received by your office. Your letter further advised me to contact the Hidalgo County District Clerk, with any questions I may have.

It is my understanding, that at this time, the mentioned application was sent and received by your office and filed on September 2, 2015. It appears that, the mentioned application was received by your office, a day after you sent me the mentioned letter.

Enclosed you will find the following pleadings: Applicat's Motion for Remand for an Evidentiary Hearing, Applicant's Request for Judicial Notice and the Applicant's Objections to the State's Response. all to be filed with the current application for writ of habeas corpus, and brought to the attention of the Court, as time permits.

In the enclosed, self-addressed stamped envelope, please return to me a stamped filed copy of this cover-letter.

Thank you for your attention and assistance.

Respectfully,

Valentin Moreno Jr.

cc:file

49,474-05

IN THE COURT OF CRIMINAL APPEALS

AUSTIN, TEXAS

| | | |
|---|---|---|
| EX PARTE | § | Writ NO. _____ |
| | § | |
| VALENTIN MORENO, JR. | § | Out of the 332nd District Court, |
| | § | |
| | § | Cause No. CR-0517-96-F |
| APPLICANT | § | |
| | § | Hidalgo County, TEXAS |

## APPLICANT'S REQUEST FOR
## JUDICIAL NOTICE

TO THE HONORABLE JUSTICES OF SAID COURT:

COMES NOW, Valentin MOreno, Jr., Applicant pro se, in the above referenced cause, and respectfully files this Applicant's Request for Judicial Notice. In support thereof, the applicant would show the following:

I.

Pursuant to Rule (c), (d), and (e) of the Texas Rules of Evidence, Applicant respectfully requests the Court take Judicial Notice.

II.

(1) On March 3, 1997, Applicant was convicted by a jury of the offense of capital murder and sentenced to life imprisonment.

(2) On June 15, 2015, Applicant filed his third application for writ of habeas corpus (hereinafter, cited as AA-3), under Articles 11.07 and 11.073 of the Code of Criminal Procedure.

(3) The State filed their Response to AA-3 and the state's Findings of Fact, Conclusions of Law, Recommendation and Order on July 8, 2015. Applicant did not recieve a copy of those pleadings, till July 21, 2015.

(4) Applicant has been informed that, 332nd District Court Judge Mario E. Ramirez, Jr., adopted the State's proposed Findings of Fact, Conclusions of Law, Recommendation and Order

Page 1.

III.

Comes now Applicant, arguing that the State is attempting to mislead this Court, with false statements. Additionally, the State has elected to ignore and not respond, to Applicant's claims submitted under Article 11.073 and this Courts ruling in Ex Parte Robbins, 2014 Tex. Crim. App. LEXIS 1900. Furthermore, Applicant would bear emphasis that, the State's Response has admitted and conceded THAT, Applicant meets the provisions set forth in art. 11.073, and that the State did engage in prosecutorial misconduct. Based on the foregoing, Applicant respectfully asks this Court to take Judicial Notice.

IV.
ARGUMENT

IN AA-3, Applicant argued that, the State influenced and/or contaminated the in-court-identification of a "critical" state witness: Beatrice Trevino (hereinafter, Ms. Trevino), with unduly suggestive post-event information and post-event misinformation, (hereinafter, PEI & PEM).

The essence of Applicant's argument in AA-3, is based on what Ms. Trevino alleged, at applicant's trial, after testifying for the State. According to Ms. Trevino, [b]efore applicant's trial, she confessed to the lead prosecutor (Sofia Arizpe), that she believed she had mis-identified the applicant. In response, the prosecutor tells Ms. Trevino that, she is not making a mistake because another witness has also identified the applicant and two witness couldn't be wrong. [See Exhibit A, Pages 13, 19 & 20, attached hereto.]

In regards to this argument, the State's response alleges:

> [T]his claim has been litigated on direct appeal adversely to applicant. Further, the only "new" aspect of this claim is that the witness was influenced by some post event information. However, the post event information applicant complains of was only provided to the witness **after** she testified in his trial. The State contends this could not have influenced her testimony. [See Exhibit B, "State's Response", Pg. 5, Footnote 3, attached hereto.]

First, Applicant would shed light and substantiate his position on this "before" and "after" debate. Applicant is supporting his argument that, the State influenced Ms. Trevino's identification with PEI and PEM, with **"Ms. Trevino's testimony from applicant's trial."** The "[o]nly" way that, Ms. Trevino could have testified about what occurred between her and the lead prosecutor, [d]uring applicant's trial, the 'incident between her and the prosecutor had to have occurred "[b]efore" applicant's trial. [See Exhibit A, "Beatrice Trevino's Trial Testimony", Pg.13, 19 & 20.]

Second, Applicant contends that, when the above "before" and "after" issue in controversy is resolved, the aftermath is an **admission** by the State that, **"the State 'did' influence Ms. Trevino with the PEI applicant complains about."** [See Exhibit B, "State's Response", Pg.5, Footnote 3.]

Third, Applicant contends that, Hidalgo County Assistant District Attorney Michael W. Morris has violated State Bar Rule 3.03 (a)(1) & (5), by knowingly and intentionally attempting to defruad this Court, with a false statement. The trial court record is clear, the incident where Ms. Trevino was exposed to suggestive PEI, occurred "before" applicant's trial. Mr. Morris in the State's response, attempts to deceive this Court with a false statement and mis representation of the facts, solely to cover-up a serious act of prosecutorial misconduct. For the foregoing reasons, applicant respectfully requests for a hearing and sanctions, as per T.R.A.P 52.11.

V.
ARGUMENT

In AA-3, Applicant argued that, the State presented the false scientific testimony of Dr. A.J. Alamia (hereinafter, Dr. Alamia), and that the State relied on Dr. Alamia's false testimony at trial. The essence of this argument

Page 3.

was argued by Applicant in 'two' ways. First, under an actual innocence claim, under Schlup v. Delo, 513 U.S. 298, 315 (315). Applicant alleged that the State presented and obtained the primary conviction, with the false scientific testimony of Dr. Alamia. A constitutional violation that, resulted in the conviction of one who is innocent. Second, sought habeas relief under the newly enacted Article 11.073, of the Code of Crim. prod. In said article it states in part: (a) This article applies to relevant scientific evidence that: (2) **contradicts scientific evidence relied on by the State at trial.**

Through Dr. alamia's scientific testimony, the State led the jury to believe that, in traumatic event the human memory functions like a camera. In the State's closing arguments, the State emphasized on Dr. Alamia's analogy that the human memory works like a camera, to bolster the trial testimonies of the State's other "key" witnesses.

In support of his arguments in AA-3, Applicant submitted an affidavit from psychology professor Dr. James Aldridge. According to Dr. Aldridge, the human memory does "[n]ot" function like a camera, and the scientific trial testimony of Dr. Alamia was misleading and false. [See Exhibit C, "Dr. James Aldridge's Affidavit, attachered hereto.] Additionally, in support of Dr. Aldridge's affidavit, Applicant also submitted a report from the Innocence Project and a 2012 unanimous decision by the New Jersey Supreme Court (state v. Larry R. Henderson).

In regards to this argument, the State's Response alleges:

[A]pplicant supports the claim that this witness provided "false" testimony by way of an opinion provided by another expert. As such, this is more properly a battle of experts rather than "false" testimony. [See Exhibit B, state's Response", pg.5, footnote 2.]

First, Applicant did not only present the opinion of another expert (Dr. Aldridge). In support of that argument, and inconjuction of dr. Aldridge's affidavit, Applicant presented data from the Innocence Project. Said data

## VERIFICATION

I, Valentin Moreno, Jr., hereby declare under the penalty of perjury, that the contents in the foregoing motion are true and correct.

Done on this _____ day of _____, 2015.

_____
Valentin Moreno, Jr.

## CERTFICATE OF SERVICE

I, Valentin Moreno, Jr., hereby certify that the original copy of applicant's request for Judicial Notice, was sent by U.S. Mail to the Clerk of the Court of Criminal Appeals, and a copy sent to hidalgo county District Clerk and hidaldgo county assistant district attorney Michael W. Morris.

Done on this _____ day of _____, 2015.

_____
Valentin Moreno, Jr.

shows that, in over 75 percent of DNA exonerations the principle cause for the erroneous guilty verdict was mistaken eyewitness identifications. Most of those DNA exoneration cases, "involved a traumatic event." These DNA exoneration cases are "proof", that the human memory does not function like a camera. There has been over 2000 DNA exoneration cases since Applicant's trial. Furthermore, Applicant would vigorously add emphasis to the decision by the New Jersey Supreme Court, the essence of said case is eyewitness identifications and the scientific evidence on that subject.

In regards to the State's response, that dr. Alamia's trial testimony and Dr. Aldridge's affidavit, amount to nothing more than a battle of experts. Applicant argues and would ask this Court to take Judicial Notice, that the State has incidentally conceded that, Applicant meets the provisions under article 11.073(a)(2). Applicant contends that a "battle of experts", translates into contradicting experts. [see Exhibit B, Pg.5, Footnote 2.]

The scientific evidence Applicant has presented in support of this argument does much more than just contradict, the scientific relied on by the State at trial. Because this issue is a previously, unresolved issue in controversy, that if resolved in applicant's favor would entitle him to habeas relief. Applicant is requesting this Court take Judicial Notice of the State's Reponse (e.g., "battle of experts"), and all the scientific evidence has presented. The "battle" is a (20) year change in expert "methodolgy". See, art. 11.073 (d) (eff. 9/01/15).

## VI.
### STATE BAR RULE 3.03 VIOLATIONS

Applicant has identified violations of State Bar Rule 3.03, by a represntative of the Hidalgo County District attorney's Office. Assistant District michael Morris has made false statements on critical issues, surrounding an actual innocence claim. pursuant to the foregoing, Applicant respectfully requests a hearing and sanctions, as per T.R.A.P. 52.11; Tex. R. Prof'l Discp. conduct 8.03 and 8.04.

## VII.
### CONFLICT OF INTEREST

Applicant would respectfully ask this Court to take Judicial Notice that, the enactment of State Bar Rule of disciplinary Procedure 15.06(c), creates of conflict of interest. In most, if not all, state habeas corpus litigation, is handled by the same district attorney's office that convicted the habeas corpus applicant. This 'includes' putting together "proposed Findings of Fact, Conclusions of Law, Recommendations and Orders", which the district courts almost always adopt.

Applicant contends that, that there is a serious "conflict of interest", when district attorneys are confronted with claims of prosecutorial misconduct that can result in sanction and/or imprisonment. It is either the same district attorney responding for themselves and/or their brethern, pursuant to claims of habeas corpus on prosecutorial misconduct, thwarting art. 2.01 C. Cr. P.

Thus, Applicant asks this Court to take Judicial Notice that the enactment State Bar Rul of Disciplinary Procedure 15.06(c), creates a conflict of interest. Specifically, to "Proposed Findings of Facts, Conclusions of Law, Recommendation and Order".

### PRAYER

WHEREFORE, PREMISES CONSIDERED, APPLICANT respectfully prays that this Honorable Court, accepts the foregoing and takes judicial Notice of the issue presented therein. And, grants any relief this Court deems proper.

Done on this 3/rd day of July, 2015.

respectfully Submitted,

Valentin Moreno, Jr., Pro se
788216, Robertson Unit
12071 FM. 3522
abilene, Texas 79601

Page 6.

## VERIFICATION

I, Valentin Moreno, Jr., hereby declare under the penalty of perjury, that the contents in the foregoing motion are true and correct.

Done on this 31st day of July, 2015.

Valentin Moreno, Jr.

## CERTFICATE OF SERVICE

I, Valentin Moreno, Jr., hereby certify that the original copy of applicant's request for Judicial Notice, was sent by U.S. Mail to the Clerk of the Court of Criminal Appeals, and a copy sent to hidalgo county District Clerk and hidaldgo county assistant district attorney Michael W. Morris.

Done on this 31st day of July, 2015.

Valentin Moreno, Jr.

BEATRICE TREVINO,

the witness, having been previously examined, cautioned and sworn upon her oath to tell the truth, the whole truth and nothing but the truth, then testified as follows, to-wit:

## DIRECT EXAMINATION

BY MR. GOULD:

Q. Please state your name.

A. Beatrice Trevino.

Q. Okay. And you are the same Beatrice Trevino that testified previously in this case?

A. Yes, sir.

Q. Okay. Now, after your testimony on Tuesday afternoon, you approached us right after that; is that correct?

A. Yes, sir.

Q. Okay. And that's myself and Mr. McInnis?

A. Yes, sir.

Q. Okay. Now, you also recall having testified about Catalino and Valentin and there being some question about there being two people named Cat?

A. Yes, sir.

Q. Okay. What is it that you wanted to explain about that?

A. On the day I went to give my statement, I recall before I gave my statement that I had mentioned Cat but I had

said Catalino first and that name is -- like, I know Cat as Valentin, so kind of -- I think I kind of got them confused as Cat because I know Valentin more than I do Catalino.

Q. Okay. And whenever you were -- who did you talk to? Do you remember?

A. The DA.

Q. Over at -- whenever you went to the sheriff's office.

A. I talked to -- the time I stated that, it was three in there. It was the head of the detectives and the other two that were -- Solis and -- I can't remember back. I can't remember.

Q. Okay. Did you view any photographs while you were there at the sheriff's office?

A. Yes, I did.

Q. Okay. And could you explain to the jury how it was that they showed you these photographs.

A. They first brought in one photograph of Valentin Moreno and then they brought in another at a separate time.

Q. Okay. And what did they do when they brought in these separate photographs?

A. What did they do?

Q. Did they ask you anything or --

A. If I recognized Valentin. And I said, "Yes, I do recognize him." The other one I could not recognize.

Q.    All right. Now, this matter of your saying you get confused --

A.    Yes.

Q.    -- did you try and ever tell any representative of the District Attorney's office about this?

A.    Yes, I did.

Q.    Who did you try to tell?

A.    I tried to tell the District Attorney.

Q.    Are you talking about Ms. Arizpe?

A.    Yes.

Q.    Okay. And when did you first tell her about this?

A.    Tuesday.

Q.    Tuesday?

A.    Yes.

Q.    Okay. And that was before your testimony; is that correct?

A.    Yes.

Q.    And was there any response in reference to that?

A.    Yes.

Q.    And what was that response?

A.    Something like I was changing the story, that I had already given a statement. And I tried to explain this had happened before I gave my statement.

Q.    Okay. And, so, what was the -- what was the bottom line that you were told?

A.   That I was trying to change my statement but I'm not trying to change my statement.  I'm just trying to state something that had happened before I stated my statement.

Q.   Okay.  All right.  Now, did you ever have an occasion to speak with Ms. Arizpe before Tuesday?

A.   Yes.

Q.   Okay.  And when was that, if you remember?

A.   I don't recall the date.  She called -- she had called me twice on the phone and once she went to my house.

Q.   Okay.  And when she went to your house, did you explain to her any reservations about your identification of any people there?

A.   Yes.

Q.   Okay.  What did you tell her then?

A.   At the time she went to my house I told her what I could recall on my statement.  And she had -- she said something about, "Well, it has to be correct," or something like that, "because somebody else states the same."  And I was like, well, I can't be a hundred percent sure so I cannot say that I was a hundred percent sure.

          MR. GOULD:  I'll pass the witness.

          THE COURT:  Ms. Arizpe.

          CROSS EXAMINATION

BY MS. ARIZPE:

Q.	Mrs. Trevino --

A.	Yes, ma'am.

Q.	-- you gave a statement to the police department; is that correct?

A.	Yes, ma'am.

Q.	And you've testified before; is that correct?

A.	Yes, ma'am.

Q.	And the last time you were called in not by the State but by the Defense; is that correct?

A.	Yes, ma'am.

Q.	And in your testimony did you not say pursuant to the questions of the attorney when you were asked, "Would you please -- one at a time, who was the first guy that got into the vehicle"?

A.	Yes.

Q.	"Juanito was the driver."

	"Okay.  And guy number two?"

	"Valentin Moreno, Joe Garcia."

	"And the third?"

	"The fourth I saw but I did not recognize."

	Do you remember saying that?

A.	Yes, ma'am.

Q.	You never mentioned anything about a Catarino; is that correct?

A.    No, ma'am.

Q.    Okay.

A.    But --

Q.    Now, you were asked again, "You've indicated -- okay. Was Juanito carrying any weapon, if you saw?"

"No."

"Okay.  Was Valentin carrying a weapon, if you know?"

"Yes."

"What weapon was he carrying?"

*Assault Rifle* "A cuerno de chivo."

"And was Joe -- was what has already been identified as Joe Garcia carrying any weapon?"

"Yes."

"And what was that?"

"A handgun."

"And that fourth person that you have not been able to identify but you have told us it's not Jessie Trevino, was he carrying a weapon?"

"Yes."

"And what kind of weapon was that?"

"I'm not sure what kind of rifle but it was a rifle."

Do you remember that testimony?

A.    Yes, ma'am.

Q. Do you remember your testimony also when I asked you about our conversations at your house --

A. Yes, ma'am.

Q. -- that you said that you did not recall because you had not read your statement?

A. Yes.

Q. Do you also recall in your statement that you gave to the sheriff's office when you said, "I then saw Juanito, Valentin Moreno, also known as Cat, and Joe Garcia start to jump into Juanito's red Pontiac Sunbird"?

A. Yes.

Q. Do you remember saying that?

Do you remember signing your statement on December 21st of 1995?

A. Yes, ma'am.

Q. Do you remember giving this statement to Joseph Buenrostro?

A. Yes.

Q. And when we discussed this again, isn't it true that I told you, well, you've already testified under oath --

A. Yes.

Q. -- about one thing? You gave a statement under oath about the same thing.

A. But as I tried to explain, this was before I gave my

statement and there was three people there that heard what I had stated.

Q. Okay. But when you signed this statement, did anybody force you to sign it?

A. No.

Q. When you came into this courtroom, did you ever tell the jury that you were not sure about Valentin Moreno?

A. I told them that I wasn't a hundred percent sure.

Q. That's correct. You said not one hundred percent sure.

A. Right.

Q. But you never said anything about not being sure about Valentin at all being there --

A. Uh-huh.

Q. -- isn't that correct?

A. That's correct.

Q. And you never once in that trial mentioned a Catarino, did you, not once?

A. No, I did not. But I did mention it --

Q. But not in the trial?

A. No.

Q. That's all I want to know.

A. Not in the trial.

Q. In the trial you never mentioned him.

Now, this Catarino that you're talking about, do you know his last name?

A. Herrera.

Q. Okay. Where does he live?

A. Edinburg.

Q. Okay. And, so, this -- when you came to my office, I told you, well, it's not in your statement and you never testified under oath --

A. Right.

Q. -- and you were placed under oath.

A. Right. But as --

Q. Now, let me --

A. Try --

Q. Now, let me ask you this, please: Are you telling me now and this jury that you lied in your statement?

A. I did not lie in my statement but there is some stuff that I remember now that did not pertain to the other case.

Q. Okay.

A. And I do wish to say that at this time.

Q. Okay. Okay. This is all I'm asking you: Did you lie in this statement when you said Valentin Moreno, also known as Cat, jumped into Juanito's red Pontiac? Did you lie here?

A. No.

Q. Did you lie under oath when you were asked about Valentin Moreno and you said he was carrying a weapon,

a cuerno de chivo? Did you lie under oath here?

A. Not under oath. Not intentionally.

Q. Okay. Well, I mean, it's one or the other, right?

A. Well, it's really not if I confused the nicknames with the names.

Q. But you know the two individuals, don't you?

A. I know Valentin more than I do Catalino.

Q. Okay. And isn't it true that you indicated in your testimony when you testified under oath --

A. Right.

Q. -- Joe Garcia, Juanito Trevino, and Valentin Moreno -- when you testified under oath, the only person you said was not in the car was Jesus Trevino?

A. Right. That is correct.

Q. And you never told us about Catarino at all?

A. No.

MS. ARIZPE: I pass the witness, Judge.

REDIRECT EXAMINATION

BY MR. GOULD:

Q. But you did tell the sheriff's office about Catalino early on before you gave your statement?

A. Yes.

Q. Okay. And you attempted to explain your confusion to Ms. Arizpe before you testified under oath in court the last time, didn't you?

A.    Yes.

Q.    And Ms. Arizpe tried to say, well, somebody else has identified so and so, so you've got to go ahead and stick with your statement?

MS. ARIZPE:  Objection, Your Honor. Counsel is speculating as to what that statement may have been, Your Honor.  He was not present.

THE COURT:  Sustained.  Rephrase the question.

BY MR. GOULD:

Q.    Okay.  What was it that was said?

A.    To the point where I got it -- I got it as she's stating that two people couldn't be wrong, one being at the scene where they were in and one being at the scene where the shooting was at.  And that's when I disagreed and I said I couldn't be a hundred percent sure what had happened over there because I wasn't over there.

Q.    Okay.  And all of these statements that you were asked about in the last time you testified, all of those statements were made after you had expressed your reservations to Ms. Arizpe when she came to your house?

A.    Yes.

MR. GOULD:  I pass the witness.

THE COURT:  Ms. Arizpe.

RECROSS EXAMINATION

MAGGIE HINOJOSA, C.S.R.

20

BY MS. ARIZPE:

Q. At the last trial, Ms. Trevino, you remember we addressed that situation at your house where you had said that you were not sure?

A. Yes, ma'am.

Q. Let me read this to you and see if you recall my question to you in court.

"And you told me that you were distracted and turned away and that you didn't know who got into the car?"

Your answer, "I also told you I didn't recall my statement."

"Okay. But at what point in time -- but in that point in time you told me that you were distracted"?

A. Yes.

Q. "I didn't recall my statement," is your answer.

"On your statement you said that?"

"I told you that I didn't recall what I wrote -- I had told them in my statement."

Question, "And remember that I asked you if you said in your statement that Juanito, Valentin, and Joe got into the car. Would that be correct?"

And do you remember telling me, "I can't say that because I was distracted and looked away"?

A. Yes.

Q. Now, remember that conversation?

A. Yes, ma'am.

Q. And this is your answer: "I can't say that I can pinpoint them a hundred percent. That's what I told you."

"Okay. Because it's a hundred percent that you couldn't pinpoint them, a hundred percent?"

And you proceeded to say you were a hundred percent that Jessie wasn't there.

Now, in that statement remember that you said you were distracted and you weren't sure who got into the car?

A. Yes.

Q. When we came into court, what you said in court, "No, that's not what I meant. I didn't remember what was in my statement," remember that?

A. Yes.

Q. And when you came to court to testify, the first thing that the defense attorney did was to allow you to take your statement to read it.

A. Yes.

Q. And then you testified and said what you said in your statement was correct. Do you recall that?

A. What I said in my statement was, if I recall, some of the stuff wasn't in there and some of the stuff that I

said was --

Q. Okay. Well --

A. -- revised.

Q. -- let me go to specifics then. Let me go to specifics.

A. Okay.

Q. You said that what was correct in your statement was the three guys. You were not a hundred percent sure but there were three guys.

A. The fourth one, I didn't recall.

Q. The fourth guy you later indicated you were distracted at some point, may have not seen him, but you knew it was not Jesus Trevino?

A. Yes.

Q. And that's correct, isn't it?

A. Yes, ma'am.

Q. Okay. And the last time you never mentioned Catarino to the defense attorney. You never mentioned it to the court, to the jury --

A. Right.

Q. -- or to me; is that correct?

A. That is correct. But to each case you remember a little bit more that pertains to that particular case, and this is the case where I remember that part.

Q. Let me ask you this: Are you saying Catarino Herrera

was in that car and had the cuerno de chivo? Is that what you're saying?

A. I'm not stating that, ma'am.

Q. Okay.

A. I'm stating that I confused the two names, two of the nickname.

Q. Okay. Now, is Valentin Moreno, Jr., known as Cat to you?

A. Yes.

Q. And you've known Valentin Moreno since what year?

A. '92.

Q. And the reason you know Valentin Moreno since '92 is because you were a security guard at P.S.J.A. South?

A. Yes, ma'am.

Q. And that's where you met Valentin Moreno?

A. Yes, ma'am.

Q. And you had seen him hanging around at times with your nephews?

A. Yes, ma'am.

MS. ARIZPE: I pass the witness.

MR. GOULD: No questions, Your Honor.

THE COURT: All right. Step down. You are subject to recall.

Your next witness.

MR. McINNIS: Judge, we would call Sabrina

MAGGIE HINOJOSA, C.S.R.

24

Cause No. CR-0517-96-F(3)

| | | |
|---|---|---|
| Ex parte | § | In the District Court |
| | § | |
| Valentin Moreno, Jr., | § | 332nd Judicial District |
| | § | |
| Applicant | § | Hidalgo County, Texas |

## STATE'S RESPONSE TO APPLICATION FOR A WRIT OF HABEAS CORPUS SEEKING RELIEF FROM FINAL FELONY CONVICTION UNDER CODE OF CRIMINAL PROCEDURE, ARTICLE 11.07

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas, by and through the Criminal District Attorney of Hidalgo County, and files this Response to Application for a Writ of Habeas Corpus Seeking Relief from Final Felony Conviction under Code of Criminal Procedure, Article 11.07, and would show that, pursuant to Section 4 of Article 11.07 of the Texas Code of Criminal Procedure, no hearing is necessary in this matter; and that, in fact, the application for a writ of habeas corpus should be DISMISSED.

### STATEMENT OF FACTS

The records of the case below reflect the following:

1. On March 3, 1996, Applicant was convicted by a jury of the offense of capital murder and was sentenced to life Imprisonment in the institutional Division of the Texas Department of Criminal Justice.

8. On June 15, 2015, Applicant filed his third application (hereinafter cited as AA) for a writ of habeas corpus under article 11.07 of the Texas Code of Criminal Procedure alleging: (1) prosecutorial misconduct; (2) due ineffective assistance of counsel; (3) cumulative error; and (4) actual innocence.

9. The State was served with Applicant's Application on June 23, 2015, and its response is therefore due no later than July 8, 2015. *See* TEX. CODE CRIM. PROC. art. 11.07 § 3(b) (2015).

10. This Court must determine whether or not there are controverted, previously unresolved facts, material to the legality of Applicant's confinement no later than July 26, 2015. *See id.* § 3(c).

## ARGUMENT

In his first application for a writ of habeas corpus, Applicant raised issues which challenged the merits of the underlying conviction. On April 24, 2002 Applicant's first application was properly denied. (WR-49,474-02). On May 10, 2011, Applicant filed a second application for writ of habeas corpus, which was dismissed as subsequent under section 4 of Article 11.07 of the Texas Code of Criminal Procedure. (WR-49,474-04). Applicant filed a second subsequent writ asserting alleging: (1) prosecutorial misconduct; (2) due ineffective assistance of

Applicant asserts that he is actually innocent and that his conviction is a result of constitutional violations. AA at 6, 8, 12. Specifically Applicant alleges that: the prosecution engaged in misconduct by eliciting "false testimony" from defense expert Dr. A.J. Alamia[2]; the prosecution influenced State witness Beatrice Trevino's identification with unduly suggestive post-event information[3]; the State presented false testimony through Yvonne Gonzales; and the State withheld ballistic evidence. AA at 6-7. Additionally, Applicant alleges that trial counsel was ineffective for: failing to investigate Dr. Alamia's proposed Scientific testimony; investigate Yvonne Gonzales' identification; failed to investigate ballistic evidence; failed to investigate prior incidents with Det. Buenostro; and Counsel failed to protect Applicant's interests and constitutional rights with regards to Beatrice Trevino's revelation regarding her identification. Applicant alleges that he meets the exception to the prohibition against subsequent writ applications set forth in Section 4(a)(2) of the Code of Criminal Procedure.

To establish that he has met the "fundamental miscarriage of justice" exception in Section 4(a)(2), an applicant is required to make a prima facie showing of actual innocence in order to demonstrate that the constitutional

---

[2] Applicant supports the claim that this witness provided "false" testimony by way of an opinion provided by another expert. As such, this is more properly a battle of experts rather than "false" testimony.

[3] This claim has been litigated on direct appeal adversely to applicant. Further, the only "new" aspect of this claim is that the witness was influenced by some post event information. However, the post event information applicant complains of was only provided to the witness *after* she testified in his trial. The State contends this could not have influenced her testimony.

testimony[4]. See Applicant's Exhibits A-7 and A-13[5]. This does not establish that applicant is actually innocent rather; it establishes that if the expert is to be believed, the eye witness' testimony might be flawed. Without definitive evidence that Applicant did not participate or could not have participated, these experts do not establish any claim of actual innocence. As for Yvonne Gonzales' affidavit, it merely states that she cannot be sure her identification of Applicant was properly. See Applicant's Exhibit A-16. Given the intervening years and the fact that she does not state that Applicant was not a participant, this affidavit does not provide affirmative evidence which shows or tends to show that Applicant is actually innocent. Rather, it merely states that Ms. Gonzales is no longer as sure as she was at trial of her identification of Applicant. Applicant must make some showing of actual innocence; not just raising some doubt as to his guilt. See Ex parte Franklin, 72 S.W.3d 671, 677 (Tex. Crim. App. 2002).

As such, Applicant's claim is procedurally barred by the prohibition against subsequent writs and the court should not consider the merits of or grant relief based upon the subsequent application.

WHEREFORE, PREMISES CONSIDERED, the State prays:

---

[4] Each expert also states that they were available to testify at the time of the trial; as such, the evidence is not newly discovered as it would have been available at the time of Applicant's first writ. See Applicant's exhibits A-7 and A-13.

[5] Further, the State would point out that Mr. Scott's "opinion" on what a witness could see is outside of his expertise as a ballistics expert.

## Certification of Compliance

I certify that this application is in compliance with 73.1 (d), (e) and (f), and is comprised of 1789 words.

Michael W. Morris

## Certificate of Service

I hereby certify that a copy of the "State's Response to Application for a Writ of Habeas Corpus Seeking Relief From Final Felony Conviction Under Code of Criminal Procedure Article 11.07" was served on Valentin Moreno, Jr., TDCJ number 788216, Robertson Unit, 12971 FM 3522, Abilene, TX 79601, on July 8, 2015, via certified mail, return receipt requested.

Michael W. Morris

## Certification of Compliance

I certify that this application is in compliance with 73.1 (d), (e) and (f), and is comprised of 1789 words.

_____

Michael W. Morris

## Certificate of Service

I hereby certify that a copy of the "State's Response to Application for a Writ of Habeas Corpus Seeking Relief From Final Felony Conviction Under Code of Criminal Procedure Article 11.07" was served on Valentin Moreno, Jr., TDCJ number 788216, Robertson Unit, 12971 FM 3522, Abilene, TX 79601, on July 8, 2015, via certified mail, return receipt requested.

_____

Michael W. Morris

EXHIBIT C

NO _____

_____        _____
_____        _____
_____        _____
_____        _____
_____        _____
_____

## AFFIDAVIT

THE STATE OF TEXAS
COUNTY OF <u>HIDALGO</u>

  BEFORE ME, the undersigned authority, on this day personally appeared
JAMES ALDRIDGE, who
swore or affirmed to tell truth, and stated as follows:

    "My name is JAMES ALDRIDGE

I am of sound mind and capable of making this sworn statement. I have personal knowledge of
the facts written in this statement. I understand that if I lie in this statement I may be held
criminally responsible. This statement is true.

1. I received a Ph.D. in Experimental Psychology with a subspecialty in human learning and
memory from the State University of New York at Binghamton in 1976. I have been a
professor in the Psychology Department at the University of Texas Pan American and its
predecessors since 1977, where I have taught advanced courses in memory for my entire time
there. I have also produced numerous articles and presentations on memory and the
perception of situations in professional journals and at professional conferences.

2. I am speaking for myself and not for the university.

3. I have never met Valentin Moreno and am offering the following information without a fee,
as a public service. All information is verifiably well within my area of expertise.

4. Mr. Moreno has asked me to comment on an assertion made in his trial and provided me with pages 90 through 110 of Volume XVII of the transcript. The witness appears to assert that in individual emotional situations memory always becomes highly accurate or photographic. I declare with a a reasonable degree of scientific certainty that such an assertion was misleading and not true, and was not an accepted characteristic indicated by memory research at the time of Mr. Moreno's trial. In fact, intense emotionality may diminish the accuracy of memory. The assertion made by the witness to Mr. Moreno's jury was therefore incorrect.

5. It was suspected at one time that memories for large-scale earthshaking events, such as the bombing of Pearl Harbor or President Kennedy's assassination, are unusually accurate. However, even in these situations it turns out that the circumstances may make memories quite vivid even if they are inaccurate. Vividness being mistaken for accuracy may cause a person to be quite confident of a false memory.

6. In two thirds of convictions overturned on the basis of DNA evidence, the convictions were at least in part based on eyewitness testimony. Although Mr. Moreno's case does not involve DNA evidence, the frequency of inaccurate eyewitness testimony revealed by these cases is an important indicator that memories of eyewitnesses are not as reliable as once thought.

7. Mr. Moreno also asked me to comment on whether post-event information may lead to distortion of memory for the event. The answer is definitely yes, and this occurs to a much larger degree than common sense would lead one to expect. This was established as early as 1974, when a researcher named Elizabeth Loftus studied the effect of questions asked after viewing an automobile accident. If a question included the word "smashed", witnesses were almost twice as likely to later falsely remember broken glass than if the same question used the word "hit". Worse, the false detail apparently became a permanent part of the witness's memory of the accident. This result spawned a large amount of research which confirmed and expanded the finding that even seemingly trivial information after an event could cause large distortions in memory of the event.

8. I was working at the University of Texas Pan American in Edinburg at the time or Mr. Moreno's trial, as was another memory expert who could have also testified to points 4 - 7 above. I, at least, was never contacted. If I had been I would have testified to them as I am doing now, pro bono.

State of Texas
County of Hidalgo

SWORN to and SUBSCRIBED before me, the undersigned authority, on the _26_ day of _November_ · 2014 year, by

_James Aldridge_
[PRINT the first and last names of the person who is signing this affidavit.]



RAMONA A. MANCHA
MY COMMISSION EXPIRES
June 1, 2017

Notary Public, State of Texas [Notary's signature.]

[Notary's seal must be included.]